**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**CHARLES JAMES FISHER,**

        **Plaintiff,**

**v.**                                 **Case No.: 2:19-cv-00032**

**ANDREW M. SAUL,
Commissioner of the
Social Security Administration,[1]**

        **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

    This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 11, 12).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Commissioner of the Social Security Administration, Andrew M. Saul, is substituted for former Acting Commissioner, Nancy A. Berryhill, as Defendant in this action.

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **GRANTED**, to the extent that it requests remand of the Commissioner's decision, (ECF No. 11); that the Commissioner's motion for judgment on the pleadings be **DENIED**, (ECF No. 12); that the decision of the Commissioner be **REVERSED**; that this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On March 19, 2015, Plaintiff Charles James Fisher ("Claimant") filed an application for DIB, alleging a disability onset date of February 4, 2015 due to colon cancer of an unknown stage, atrial fibrillation ("AFib"), chronic obstructive pulmonary disease ("COPD"), high blood pressure, hypothyroidism, and 20 pounds of pressure behind his left eye. (Tr. at 322-23, 339). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 245-49, 251-53). Claimant subsequently filed a request for an administrative hearing, which was held on October 3, 2017 before the Honorable David Read, Administrative Law Judge (the "ALJ"). (Tr. at 178-206). On January 25, 2018, the ALJ issued a written decision, finding that Claimant was not disabled as defined in the Social Security Act. (Tr. at 104-23). The ALJ's decision became the final decision of the Commissioner on November 28, 2018 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings.

(ECF Nos. 9, 10). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 11), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 12), to which Claimant filed a reply. (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 57 years old on his alleged disability onset date and 60 years old on the date of the ALJ's decision. (Tr. at 115). He obtained a GED and worked as a mining laborer, shuttle car operator, and EIN/Float Man. (Tr. at 199, 340). His primary language is English. (Tr. at 338).

## III.    Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in

3

Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a

medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2020. (Tr. at 109, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since February 4, 2015, his alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had a severe impairment of COPD. (*Id.*, Finding No. 3). The ALJ considered and found non-severe Claimant's colon cancer,

status post colon resection; AFib; hypertension; glaucoma; carpal tunnel syndrome, status post release on the right; degenerative disc disease; degenerative joint disease; and adjustment disorder. (Tr. at 109-10).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 111-12, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defi[n]ed in 20 CFR 404.1567(c) except the claimant can frequently climb ramps, stairs, ladders, ropes, or scaffolds. He can frequently stoop, kneel, crouch, or crawl. The claimant can occasionally work at unprotected heights, in humidity and wetness, and in dust, odors, fumes, and pulmonary irritants.

(Tr. at 112-15, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any of his past relevant work. (Tr. at 115, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 115-16, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as an individual of advanced age on his disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 115, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled medium exertional level work as a custodian, box maker, and counter supply worker. (Tr. at 115-16, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined

in the Social Security Act and was not entitled to benefits. (Tr. at 117, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two challenges to the Commissioner's decision. First, Claimant argues that the ALJ erroneously, and without explanation, determined at step two of the sequential evaluation that Claimant's AFib, degenerative disc disease of the cervical spine, bilateral carpal tunnel syndrome, and residual effects of his colon resection were non-severe impairments. (ECF No. 11 at 7).[2] Claimant cites medical evidence, which he contends demonstrates that the impairments met the *de minimis* severity standard. (*Id.* at 7-8). Claimant notes that medically determinable impairments are considered non-severe only if they are slight abnormalities that cause such a minimal effect on the individual that they would not be expected to interfere with the individual's ability to work irrespective of age, education, or work experience. (*Id.* at 8). In continuation, Claimant argued that the step two finding could not be construed to be harmless error because the ALJ did not analyze or include any limitations flowing from the non-severe impairments in the RFC analysis. (*Id.* at 9). In fact, Claimant cites that the ALJ explicitly only considered Claimant's COPD in assessing Claimant's RFC and gave great weight to the opinions of the state agency physicians, who did not properly consider his non-severe impairments. (*Id.* 8-9). Claimant maintains that the impact of the non-considered impairments was critical to the ALJ's ultimate decision because if his RFC had been reduced to even the light exertional level, it would have directed a finding of disability under Medical-Vocational Rule 202.06. (*Id.* at 10).

---

[2] Although Claimant mentions in one sentence in his brief that the ALJ failed to appreciate the severity of his "mental impairments," the brief and reply focus entirely on his physical impairments. (ECF Nos. 11, 15). Therefore, the undersigned does not construe Claimant's isolated statement as a challenge to the ALJ's consideration of his mental impairments.

In his second challenge to the Commissioner's decision, Claimant asserts that the ALJ did not give "good reasons" for rejecting the medical opinion of his treating physician, Hasan A. Jafary, M.D. (*Id.* at 12). Claimant contends that the ALJ summarily dismissed the opinion without considering all of its contents and did not cite any evidence to rebut it. (*Id.* at 12-13). Claimant notes that the ALJ was required to give preferential treatment to his treating physician's opinion and give good reasons for not affording it controlling weight.  (*Id.* at 10-11). Claimant argues that the ALJ's one-sentence dismissal of Dr. Jafary's opinion did not meet that standard. (*Id.* at 13).

In response to Claimant's argument regarding the step two determination, the Commissioner notes that subjective allegations, treatment, and diagnoses are not sufficient to demonstrate a severe impairment, but rather the evidence must show that the condition significantly affected the claimant's ability to do basic work activities, lasted or is expected to last for a continuous 12 months, and was not controlled by treatment. (ECF No. 12 at 12). The Commissioner cites evidence, which he argues tends to prove that Claimant recovered well from his colon resection with normal subsequent colonoscopies; his AFib was well controlled and improved during the relevant period to the point that his dosage of Coumadin was decreased; he did well following right carpal tunnel release surgery and only had mild carpal tunnel syndrome on the left; and he had only mild degeneration in his cervical spine with normal physical examination findings. (*Id.* at 12-14). Also, the Commissioner notes that Claimant continued to work at the heavy exertional level in the mining industry despite his AFib and COPD, without any indication of his conditions worsening. (*Id.* at 13). The Commissioner adds that the state agency physicians supported the step two determination; no treating physician placed any restrictions on Claimant's ability to

perform work activity; and Claimant's only pain medication at the time of his testimony in October 2017 was Tylenol. (*Id*. at 14). Finally, the Commissioner argues that the step two finding was not determinative, because the ALJ considered all of Claimant's severe and non-severe medically determinable impairments and accounted for all credibly-established functional limitations in Claimant's RFC. (*Id*. at 11).

With regard to Claimant's second argument, the Commissioner responds that Dr. Jafary's letter stating that Claimant could not maintain gainful employment was a legal conclusion, not a medical opinion, and it was thus not entitled to controlling weight or special significance. (*Id*. at 15-16). Further, the Commissioner states that the ALJ correctly concluded that Dr. Jafary gave no support for his statement and the statement was inconsistent with the evidence; including, normal medical examinations with stable findings, controlled medical conditions, the state agency opinions; and Claimant's daily activities. (*Id*. at 16-17).

Claimant filed a reply to the Commissioner's brief. He disputes that there is any indication that the ALJ considered his non-severe impairments at subsequent steps of the sequential evaluation. (ECF No. 15 at 1-2). Therefore, he restates that the ALJ's error at step two was not harmless to the ultimate decision. (*Id*. at 2). As to his second challenge that the ALJ did not fully consider Dr. Jafary's opinion or the medical evidence in support of the opinion, Claimant argues that "the Commissioner has not raised any legal issues that warrant a reply." (*Id*. at 3).

**V.    Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court. The evidence that is most relevant to the instant matter is summarized as follows:

## A. Treatment Records

On November 10, 2012, Claimant was admitted to Raleigh General Hospital after he reportedly fell out of a tree and landed on his head and neck. (Tr. at 416). His x-ray showed no evidence of fracture or subluxation, but Claimant had degenerative changes in his cervical spine. (Tr. at 451). During his admission, Claimant was also diagnosed with a new onset of AFib. (Tr. at 416). Claimant told the provider that he was previously diagnosed with a heart valve asymmetry following an echocardiogram and heart catherization in the fifth grade. (*Id*.).

Claimant returned to the hospital on November 16, 2012 due to chest pain and left lower extremity paresthesia. (Tr. at 420). His AFib was controlled, but he was at a significant risk for coronary artery disease. (Tr. at 423, 439). Thereafter, on May 2, 2014, Claimant reported to his cardiologist, Anthony McFarlane, M.D., that he felt pinching in his left chest wall once per week, which occurred upon exertion and was not relieved by anything. (Tr. at 726). His stress test on May 21, 2014 and his echocardiogram on July 1, 2014 were normal, but his Holter monitor report showed persistent AFib with rapid ventricular response. (Tr. at 739, 741-43).

Claimant followed up with Dr. McFarlane on July 22, 2014. His heart rate was controlled per his EKG, but he experienced pressure on his left side, shortness of breath, and dizziness at times. (Tr. at 722). Dr. McFarlane renewed Claimant's AFib medications. (Tr. at 723).

On December 22, 2014, Claimant had his first-ever colonoscopy, which showed several polyps, the largest of which was a moderately differentiated adenocarcinoma arising from tubulovillous adenoma. (Tr. at 456). His gastroenterologist, Syed M. Siddiqi, M.D., advised Claimant to see a surgeon, as he believed that the polyp was

indicative of early colon cancer. (*Id.*).

Claimant was examined by a surgeon and scheduled for colon resection surgery. In preparation for surgery, Claimant saw Dr. McFarlane on January 22, 2015. His AFib was still controlled per his EKG. (Tr. at 718). He had dizziness and fatigue at times, but he was otherwise doing well. (*Id.*). Claimant was instructed to continue his medications, Coumadin and Toprol, for AFib. (Tr. at 719). He was cleared for surgery from a cardiac standpoint. (*Id.*). The following day, Claimant had CT scans of his abdomen, chest, and pelvis. (Tr. at 774). There was no evidence of metastases, but he had slightly prominent mediastinal lymph nodes. (Tr. at 774-75). Claimant also had spondylosis in his lower cervical spine and minimal spurring of his thoracic spine. (Tr. at 464).

On February 6, 2015, Claimant underwent colon resection surgery. (Tr. at 474). Given the fact that the cancer had not metastasized, Claimant's oncologist advised Claimant that he would not need to undergo chemotherapy or radiation therapy. (Tr. at 775).  Claimant followed up with his internist, Surayia T. Hasan, M.D., on May 13, 2015. Claimant reported that he developed an intra-abdominal hematoma following his colon surgery that continued to cause pain in his lower abdomen. (Tr. at 683). He stated that he told his surgeon, who advised him that he should not return to work. (*Id.*). Claimant's abdominal examination and ultrasound were normal. (Tr. at 684, 687). Claimant was given access to CoagTrak in order to monitor his AFib at home. (Tr. at 684).

In June 2015, Claimant had a follow-up colonoscopy, which showed benign polyps, but no evidence of residual carcinoma. (Tr. at 772-73). Claimant saw Dr. Hasan the same month on June 15, 2015. He was doing fairly well, but he advised his physician

that he felt very tired and continued to have pain in his lower abdomen upon heavy exertion. (Tr. at 687). Regarding AFib, Claimant's International Normalized Ratio ("INR") was elevated.[3] (*Id.*). Thus, Claimant temporarily ceased taking Coumadin. (*Id.*).

On July 3, 2015, Claimant saw his internist, Dr. Jafary, and he complained of persistent fatigue since his colon resection surgery. (Tr. at 788). Dr. Jafary ordered various blood tests, and he also ordered pulmonary function testing because Claimant complained of shortness of breath. (Tr. at 790). Dr. Jafary followed up with Claimant on July 10, 2015 to go over the test results. (Tr. at 793). The chest PA showed no acute cardiopulmonary disease. (Tr. at 1003). Dr. Jafary advised Claimant that his tobacco use was causing shortness of breath, which contributed to his fatigue. (Tr. at 793). He was prescribed medication and advised to cut back on smoking. (*Id.*).

Later that month, on July 22, 2015, Claimant saw Dr. McFarlane, reporting sharp midsternal pain that occurred at rest for a few seconds two or three times per week over the past two or three months. (Tr. at 714). He also complained of occasional skipped heart beats. (*Id.*). Claimant stated that he was able to do some housework, but he suffered shortness of breath on exertion after cutting grass for 20 minutes, and he had to rest. (*Id.*).

On February 17, 2016, Claimant presented as a new patient to gastroenterologist, Husam M. Nazer, M.D. Claimant reported having dark stools, increased constipation, occasional mild abdominal soreness, lack of energy, and

---

[3] INR is monitored when a person is on a blood thinner such as Coumadin. It represents the amount of time that it takes for the person's blood to clot. If the INR value is too low, the person could be at risk for a blood clot. If the INR is too high, the person could experience uncontrolled bleeding. https://natfonline.org/2017/07/guide-inr-levels/

weakness. (Tr. at 753). He also complained of chest pain and palpitations, shortness of breath, arthritis, and back pain. (Tr. at 755). Claimant's physical examination did not reveal any issues, but he was scheduled for a colonoscopy and continued on medications. (Tr. at 755-56). Claimant's colonoscopy taken on March 16, 2016 showed no recurrence of cancer. (Tr. at 757).

Claimant followed up with Dr. Jafary on June 7, 2016. His AFib remained persistent, active, and moderately severe. (Tr. at 795). Claimant had decreased his Coumadin dosage to six milligrams because his INR was 3.1 the prior week. (*Id*.). Dr. Jafary ordered full laboratory testing in hope of returning Claimant's dosage of Coumadin to a therapeutic level, and he renewed Claimant's other medications. (Tr. at 797). Claimant followed up with Dr. Jafary several more times in June and his AFib remained persistent, active, and moderately severe. (Tr. at 798, 801, 804).

On July 26, 2016, Claimant again saw Dr. Jafary and he complained of burning pain in his neck that radiated into his right shoulder for the past month. (Tr. at 806). Claimant stated that the pain lasted all day, was worse in the evening and with physical activity, and was not relieved by anything. (*Id*.). On examination, Claimant had decreased range of motion and pain. (Tr. at 808).

On August 5, 2016, Dr. Jafary recorded that Claimant's AFib was improved, but it remained active and moderately severe. (Tr. at 813). Moreover, Claimant's INR level was too high; thus, Dr. Jafary advised Claimant to cease taking Coumadin until Monday for repeat blood testing. (Tr. at 815). Claimant was instructed to go to the nearest emergency room for any bleeding problems. (*Id*.). Three days later, Dr. Jafary again noted that Claimant's AFib was improved, but still active, moderately severe, and constant (Tr. at 815-16). Claimant's dosage of Coumadin was decreased to four

milligrams due to the fact that his INR remained too high. (Tr. at 817).

On October 11, 2016, Claimant reported polycythemia and abdominal pain to Dr. Jafary. (Tr. at 827). Dr. Jafary prescribed Prilosec and a laxative, polyethylene glycol. (Tr. at 830). He also ordered an ultrasound, which was taken two days later, but it did not reveal any issues. (Tr. at 765). Claimant saw oncologist, Mayez El-Harake, M.D., on October 19, 2016. (Tr. at 767). By that time, his abdominal pain had resolved. (*Id.*). Dr. El-Harake planned to continue taking annual CT scans of Claimant's chest, abdomen, and pelvis over the next four years due to his history of colon cancer. (*Id.*).

At Claimant's next two monthly appointments with Dr. Jafary on November 1 and December 6, 2016, there was no change in his AFib. (Tr. at 830, 835). It remained persistent, active, moderate, and constant. (*Id.*). However, on January 26, 2017, Claimant's INR was too low at 1.5. (Tr. at 902)[4]. Thus, Dr. Jafary increased Claimant's dosage of Coumadin to 7 milligrams and told Claimant to return in one week for retesting. (*Id.*). When Claimant presented for follow up on February 2, 2017, his AFib remained persistent, active, moderate, and constant. (Tr. at 903). Dr. Jafary reviewed Claimant's laboratory results and discussed them with Claimant. He increased Claimant's dosage of Coumadin to 8 milligrams because Claimant's INR remained too low. (Tr. at 906).

Later that month, on February 14, 2017, Claimant presented to Dr. Jafary for persistent numbness and tingling in his hands. (Tr. at 906-07). Dr. Jafary prescribed a wrist splint and referred Claimant to orthopedic surgeon, Syed Zahir, M.D., to evaluate whether Claimant had carpal tunnel syndrome and determine if Claimant required

---

[4] "An INR of 1.5 or lower puts you at greater risk of developing a life-threatening blood clot." https://www.health.harvard.edu/heart-health/preventing-blood-clots-is-warfarin-still-right-for-you

surgery. (Tr. at 909). Claimant saw Dr. Zahir on February 17, 2017, advising Dr. Zahir that he had increasing difficulty with pain and numbness in his hands. (Tr. at 1146). On examination, Claimant exhibited numbness in the median nerve distribution, more markedly on the right; positive Tinel's sign, more pronounced on the right; and positive Phalen tests bilaterally. (Tr. at 1146). Dr. Zahir diagnosed Claimant with bilateral carpal tunnel syndrome and synovitis of the flexor tendon. (*Id.*). He planned to proceed with surgical intervention, and he ordered an EMG, which was taken the following month and confirmed Claimant's diagnosis of bilateral carpal tunnel syndrome. (Tr. at 1025, 1148).

On March 2 and 9 and April 12, 2017, Claimant's INR remained 1.3 despite his blood thinning medication. (Tr. at 909, 915, 1165). Dr. Jafary documented that Claimant's blood was still "too thick." (Tr. at 915). Nonetheless, Dr. Jafary cleared Claimant for carpal tunnel surgery, which Dr. Zahir performed on Claimant's right wrist on April 24, 2017. (Tr. at 922, 1165). Claimant initially did "extremely well" after his surgery. (Tr. at 1153). However, on July 11, 2017, Dr. Zahir stated that Claimant was only doing "fairly well" with good movement of the fingers in his right hand, but he continued to have soreness in his right wrist. (Tr. at 1152). Claimant also had increasing difficulty with his left hand and Dr. Zahir planned to proceed with surgery on that extremity. (*Id.*).

Claimant remained on Coumadin for his active AFib until July 6, 2017 when Dr. Jafary switched him to Xarelto.  (Tr. at 1174-82). He showed improvement, as noted during his August 17 and September 5, 2017 and February 12, 2018 visits. (Tr. at 77, 1185, 1188). However, the condition remained active, constant, and moderate in severity. (*Id.*).

On March 12, 2018, Dr. Jafary noted that Claimant suffered an additional problem of neck pain that worsened in the past month, was moderately severe, and was not relieved by anything. (Tr. at 81). On examination, his neck was tender, and his range of motion was decreased. (Tr. at 83). Dr. Hassan diagnosed Claimant with cervical radiculopathy and ordered diagnostic testing. (*Id*.).

The following day, Claimant followed up with Dr. Zahir. He continued to have pain and numbness in his left hand. (Tr. at 25). Although he expressed those complaints for the past several years, he was increasingly dropping things and waking up in the night over the prior few months. (*Id*.). On examination, there were positive findings on the median nerve of the left wrist, positive Phalen test at ten seconds, and Claimant's grip strength was 60 psi. (Tr. at 26). Dr. Zahir diagnosed Claimant with carpal tunnel syndrome in his left wrist and post-operative synovitis of the flexor tendon on the right. (*Id*.). On March 14, 2018, Dr. Zahir performed surgery on Claimant's left wrist, including median ulnar nerve block and neurolysis, ulnar tunnel release, and synovectomy of the flexor tendon. (Tr. at 67).

On April 18, 2018, an x-ray was taken of Claimant's cervical spine. It showed degenerative disc disease at C5-C7 and posterior protruding osteophytes. (Tr. at 59). Claimant continued to complain of neck pain to Dr. Jafary on May 7, 2018. (Tr. at 89). He also reported abdominal pain, chest congestion, fatigue, and shortness of breath. (*Id*.). On examination, his breath sounds were decreased, and he had tachycardia and a systolic heart murmur. (Tr. at 90).

On May 15, 2018, Claimant saw Getachew Zeleke, M.D. (Tr. at 27). His AFib was noted to be controlled by a beta blocker. (*Id*.). Thus, he was continued on his medications. (Tr. at 29). Regarding Claimant's chronic chest pain, Dr. Zeleke suggested

a heart catheterization to assess for obstructive disease, and he prescribed Claimant Toporol for his unspecified tachycardia. (Tr. at 29).

Dr. Zeleke performed Claimant's left heart catherization on May 22, 2018. He did not find any significant pulmonary hypertension or significant issues in the left side of Claimant's heart, but he found nonobstructive coronary artery disease in Claimant's right coronary artery. (Tr. at 32). Dr. Zeleke recommended continued aggressive risk factor modification and strongly advised Claimant to quit smoking. (*Id.*). The following month, on June 18, 2018, Dr. Jafary noted that Claimant's AFib was improved since his last visit, but his polycythemia and AFib remained moderately severe. (Tr. at 91).

## B. Evaluation and Opinion Evidence

On June 9, 2015, state agency physician Caroline Williams, M.D., assessed Claimant's RFC based upon her review of his records. Dr. Williams found Claimant's recurrent arrythmias, colon cancer, and hypertension to be non-severe impairments. (Tr. at 213). However, she found that his combination of impairments was severe. (Tr. at 214). She opined that Claimant could perform work at the medium exertional level with frequent postural activities and no concentrated exposure to noise. (Tr. at 215-16). This RFC assessment was affirmed by Narendra Parikshak, M.D., on November 6, 2015. (Tr. at 231-34).

On February 8, 2016, Dr. Jafary wrote a letter stating that Claimant had several health factors that required him to be seen by medical professionals frequently, including heart disease and severe lung disease that needed "urgent attention otherwise he [would] face death in short time." (Tr. at 760). Dr. Jafary stated that due to the severity of Claimant's medical conditions, it was his professional opinion that Claimant could not maintain gainful employment. (*Id.*).

17

### C. Claimant's Testimony

Claimant testified during his administrative hearing on October 3, 2017. He stated that he experienced heart palpitations and tightness in his chest when he walked. (Tr. at 187-88). He also testified that he suffered from tenderness and soreness in his stomach from his colon resection, and he had trouble with bowel movements. (*Id.*). In terms of carpal tunnel syndrome, Claimant stated that he could grip things better with his right hand since his surgery, but he continued to drop things. (Tr. at 189-90). He explained that he needed to have surgery on his left hand, but he canceled the scheduled surgery because his wife passed away and he had to make arrangements. (Tr. at 190). Claimant testified that he also suffered from neck pain. (Tr. at 191). In terms of functional abilities, Claimant stated that he could only stand for 30 minutes and "walk for just a little bit" before needing to sit down and rest. (*Id.*). He testified that even carrying a gallon of milk wore him out. (Tr. at 192-93). He advised that the only pain medication that he currently took was Tylenol because he was not "big on taking medications" unless it was absolutely necessary. (Tr. at 195).

### VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

As stated, Claimant challenges the ALJ's analysis of the severity of his impairments, as well as the ALJ's evaluation of his treating physician's opinion in the ALJ's RFC finding. Each argument is considered below, in turn.

### A. Non-Severe Impairments and RFC Analysis

In his first challenge to the Commissioner's decision, Claimant argues that the ALJ did not properly evaluate the severity of his impairments at step two of the sequential evaluation. He contends that the ALJ then failed to consider the non-severe impairments in the RFC analysis, which impacted the ALJ's ultimate decision that he was not disabled.

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. § 404.1522(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a

minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). As relevant to the instant matter, basic work activities include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. 20 C.F.R. §§ 404.1522(b)(1).

The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement."). Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately

20

considered during the later steps. *Reed v. Berryhill*, No. 1:17-CV-02299, 2018 WL 2423021, at *17 (S.D.W. Va. Mar. 22, 2018), *report and recommendation adopted,* 2018 WL 2419105 (S.D.W. Va. May 29, 2018) (collecting cases).

If the sequential evaluation proceeds, the ALJ ultimately assesses the claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.*

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019), *as amended* (Feb. 22, 2019) (citations omitted).

In this case, the ALJ assessed at step two that Claimant had a single severe impairment: COPD. (Tr. at 109). The ALJ summarily concluded, without any explanation or citation to the record, that all of Claimant's other conditions—including his colon cancer status post colon resection, AFib, carpal tunnel syndrome, and degenerative joint and disc disease—were non-severe impairments. (*Id.*). Although the

ALJ asserted that he reviewed and considered all severe and non-severe impairments in formulating the RFC and, where appropriate, included limitations to address Claimant's non-severe impairments and subjective complaints, (Tr. at 111), there is no evidence of such consideration in his written opinion. Indeed, a review of the opinion reveals no analysis of Claimant's non-severe impairments, and no citations to any evidence regarding the non-severe impairments. This lack of analysis is apparent in both the ALJ's step two discussion and his RFC finding.

In fact, the only mention of a non-severe impairment concerned the status of Claimant's AFib **prior to** his alleged onset of disability. The ALJ stated that Claimant continued to work at the heavy exertional level in mines despite his non-severe AFib with no objective worsening of the condition. (Tr. at 114). The ALJ further stated that Claimant's AFib was controlled with Coumadin, and he continued to work in mines without incident with virtually no complaints. (*Id.*). However, the ALJ did not mention any of the evidence documenting the status of Claimant's Afib after he stopped working. Moreover, the ALJ did not mention Claimant's other non-severe impairments at all. Rather, the ALJ expressly stated that "[d]ue to COPD," the Claimant could perform the RFC identified. (Tr. at 115).

Reviewing the decision and the record in this matter, the ALJ's step two finding is not supported by substantial evidence. The ALJ did not provide any explanation or evidence to support his finding that Claimant's physical impairments were non-severe. Furthermore, while the step two error could be considered harmless if the ALJ proceeded to consider the non-severe impairments at subsequent steps of the evaluation, the ALJ clearly failed to do so. The ALJ stated that he considered Claimant's non-severe impairments in assessing Claimant's RFC, but the RFC discussion plainly

contradicts that assertion. The ALJ only discussed the medical evidence concerning Claimant's COPD. Although the ALJ provided some analysis of Claimant's AFib, stating that it was controlled on Coumadin therapy and Claimant worked despite that condition, the ALJ entirely overlooked Claimant's other non-severe conditions and connected the RFC limitations only to Claimant's COPD. (Tr. at 112-15).

The Commissioner provides extensive *post hoc* rationalization for the ALJ's step two determination, stating that Claimant recovered well from his colon resection with normal subsequent colonoscopies; his AFib was well controlled and improved during the relevant period to the point that his dosage of Coumadin was decreased; he did well following right carpal tunnel release surgery and had only mild carpal tunnel syndrome on the left; he had only mild degeneration in his cervical spine with normal physical examination findings; and his only pain medication at the time of his October 2017 administrative hearing was Tylenol. (ECF No. 12 at 12-14). While the Commissioner's analysis may be correct, the Court is not at liberty to parse through the record and make findings never mentioned by the ALJ. *See Fox v. Colvin,* 632 Fed. Appx. 750, 755 (4th Cir. 2015) (holding that the court erred when it "engaged in an analysis that the ALJ should have done in the first instance."). The only finding that the ALJ made relative to Claimant's non-severe impairments was the ALJ's assessment that Claimant's AFib was controlled on Coumadin. As to the other conditions, the Commissioner and the Court cannot substitute their reasoning for that of the ALJ in order to fill in obvious gaps left in the written decision.

The Commissioner points out that Claimant continued to work at the heavy exertional level in the mining industry despite his AFib with no indication of the condition worsening; the state agency opinions supported the ALJ's step two

determination; and no treating physician placed any restrictions on Claimant's ability to perform work activity. (*Id.* at 13). The ALJ likewise considered such evidence in assessing Claimant's RFC. (Tr. at 114). However, as explained above, the ALJ neglected to mention, or provide any indication that he considered, any of the evidence concerning Claimant's other non-severe impairments or any of the contrary evidence concerning his AFib.

Despite the evidence cited by the Commissioner that would appear to favor the ALJ's step two finding, the record is not so one-sided that the ALJ's utter failure to discuss Claimant's non-severe conditions can be considered harmless error. *See Brown v. Colvin,* 639 Fed. Appx. 921, 923 (4th Cir. 2016). For instance, in 2015, Claimant reported pain from an abdominal hematoma that he reportedly developed following his colon surgery. (Tr. at 683). In the subsequent months, he complained of abdominal pain upon heavy exertion and persistent fatigue since his colon surgery. He also complained of abdominal pain to his gastroenterologist and primary care physician in 2016, and again complained of abdominal pain in May 2018. (Tr. at 89, 687, 753, 788, 827).

As to his degenerative disc disease, Claimant reported back pain in February 2016, and, in July 2016, he complained of burning pain radiating from his neck into his right shoulder that started one month earlier. (Tr. at 806). The pain supposedly lasted all day, was worse in the evening and with activity, and was not relieved by any measures. (*Id.*). Claimant exhibited decreased range of motion and pain on examination. (*Id.*). Again, in March 2018, Claimant reported moderately severe neck pain that worsened in the past month and was not relieved by anything. (Tr. at 81). His neck was tender and his range of motion was decreased. (Tr. at 83). He was diagnosed

with cervical radiculopathy in March 2018. (*Id.*). His cervical spine x-ray in April 2018 confirmed that he had cervical degenerative disc disease and posterior protruding osteophytes. (Tr. at 59).

Regarding carpal tunnel syndrome, Claimant complained of pain and numbness in his hands, which increasingly caused him to drop things. (Tr. at 906-07, 1146). He was referred to an orthopedic surgeon, who diagnosed him with bilateral carpal tunnel syndrome and synovitis of the flexor tendon based on examination results and EMG testing. (Tr. at 1025, 1146, 1148). Claimant had surgery on his right wrist in April 2017, and he was initially noted to be doing "extremely well" following surgery, but his condition was downgraded to "fair" in July 2017, as he continued to experience soreness in his wrists. (Tr. at 1152-53). Claimant testified that although he had better grip following surgery, he continued to drop things. (Tr. at 189-90). Even as late as March 2018, Claimant continued to have post-operative synovitis of the flexor tendon in his right wrist. (Tr. at 26). Following his right wrist surgery, Claimant had increasing difficulty with his left hand. (Tr. at 1152). His left wrist surgery was postponed due to the death of his wife, but surgery was performed on Claimant's left wrist in March 2018. (Tr. at 67, 190).

Finally, Claimant was, as the ALJ noted, on long-term Coumadin therapy for his AFib. The condition and treatment required continuous monitoring via blood tests and EKGs to ensure that the anti-coagulant was working effectively; to that end, Claimant was also given a CoagTrak to monitor his INR level at home. (Tr. at 684, 718, 795, 797, 798, 801, 815, 902, 912, 915). While Claimant's AFib was noted to be controlled at many times in the record, it always remained persistent, active, and moderate in severity. (Tr. at 91, 795, 813, 815-16, 838, 903, 1185, 1188). Furthermore, in August 2016, Claimant's

dosage of Coumadin had to be decreased because Claimant became supratherapeutic and he risked uncontrolled bleeding. (Tr. at 815). Later, in 2017, Claimant's INR was too low and his dosage of Coumadin was increased twice. (Tr. at 902, 906). Claimant's INR remained too low despite increases in his medication at which point Dr. Jafary switched Claimant to the medication Xarelto. (Tr. at 909, 912, 915, 1182, 1185). In addition, Claimant complained of heart palpitations and tightness in his chest in his testimony in October 2017. (Tr. at 188). In 2018, Claimant had tachycardia and a systolic heart murmur. (Tr. at 90). Although his AFib was controlled by a beta blocker, his heart catheterization discovered right coronary artery disease. (Tr. at 32).

Based on the above, Claimant's AFib, degenerative disc disease, carpal tunnel syndrome, and colon cancer status post resection warranted discussion by the ALJ, or, at a minimum, the ALJ should have cited to the evidence that supported his conclusions that the impairments were non-severe. While the ALJ's conclusion that Claimant's impairments were non-severe may reasonably be supported by substantial evidence, the Court cannot evaluate the ALJ's decision without knowing the basis for it, including how the ALJ weighed and reconciled the relevant evidence. *Radford v. Colvin,* 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling.") (citing *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)). As noted, this error cannot be considered harmless because, despite the ALJ's statement that he considered all of claimant's impairments in formulating the RFC, there is no meaningful indication that they were considered at all in the decision. In fact, the RFC assessment explicitly indicates that it was based only on Claimant's COPD.

Therefore, the undersigned **FINDS** that this case must be remanded for the

ALJ to reconsider or elaborate upon his step two analysis of Claimant's impairments, and the ALJ must consider all of Claimant's medically determinable impairments, including those that are non-severe, in assessing Claimant's RFC.

### B.    Treating Physician Opinion

Claimant next argues that the ALJ did not give "good reasons" for rejecting the opinion submitted by his treating physician, Dr. Jafary. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*[5]

---

[5] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c;

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. § 404.1527(c)(2)-(6),[6] and must explain the reasons for the weight given to the opinions.[7] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is

---

*Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p,* 2017 WL 3928298 (S.S.A. Mar. 27, 2017). Claimant's application was filed in 2015. Thus, the undersigned applied the law in effect at that time.

[6] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[7] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions of record must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine

when an individual is disabled." *Id*. at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id*. at \*3.

In this case, the ALJ stated that Dr. Jafary provided an opinion that Claimant could not maintain gainful employment due to the severity of his medical conditions. (Tr. at 114). The ALJ explained that he gave the opinion little weight, as Dr. Jafary provided no support for his opinion and his opinion was inconsistent with the medical evidence of record. (*Id*.). The ALJ correctly stated that Dr. Jafary did not provide any support for his statements within his opinion letter. However, that was only one of the two reasons that the ALJ rejected the treating physician's opinion. The other stated basis was that Dr. Jafary's opinion was inconsistent with the medical evidence. Yet, the ALJ did not identify any of medical evidence that was inconsistent with Dr. Jafary's opinion. In fact, as noted, the ALJ did not cite to any of the evidence regarding Claimant's AFib, and the ALJ's only passing mention of Claimant's AFib was that it was controlled on Coumadin and otherwise concerned the time period of 2015 and earlier when Claimant was still working in the mining industry. (*Id*.).

Under the applicable law at the time of the ALJ's decision, while a statement from a treating physician was not entitled to special deference if it concerned an issue reserved to the Commissioner, a treating physician's opinion regarding the severity of a claimant's impairments warranted special consideration. 20 C.F.R. § 404.1527; SSR 96-2p, 1996 WL 374188, at \*5. Furthermore, no medical opinion from a treating source could be summarily rejected without supplying good reasons that were supported by the evidence in the case record. *Id.* Dr. Jafary's February 2016 letter provided opinions regarding the severity of Claimant's impairments, his inability to work, prognosis, and

frequency of treatment. (Tr. at 760). While the medical record may very well have refuted such opinions, the ALJ did not cite to or discuss the contrary evidence regarding Claimant's AFib or other non-severe conditions. Given the extensive longitudinal treatment history that Claimant received from Dr. Jafary, adequate discussion of the weight assigned to Dr. Jafary's opinion was particularly important. Therefore, the undersigned **FINDS** that, on remand, the ALJ should reconsider or elaborate upon the weight that he assigned to Dr. Jafary's opinion.

## VIII.  <u>Recommendations for Disposition</u>

For the above reasons, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, to the extent that it requests remand, (ECF No. 11); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 12); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** August 20, 2019

Cheryl A. Eifert
United States Magistrate Judge